**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **FARMINGTON VILLAGE DENTAL ASSOCIATES, LLC,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THE CINCINNATI INSURANCE COMPANY,** ) | |
| ) | |
| **Defendant** ) | **JANUARY 14, 2021** |

**MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S
MOTION TO DISMISS**

The Cincinnati Insurance Company's ("Cincinnati") Motion to Dismiss (Doc. No. 13) should be denied because the policy language at issue taken as a whole does not unambiguously preclude coverage. Contrary to Cincinnati's assertion, the phrase "physical loss or physical damage" does not unambiguously require some alteration in the sense of structural damage to covered property. Contaminated property that is rendered unsuitable for use has suffered an alteration from its pre-contaminated status. In support of its motion, Cincinnati made misleading arguments by relying on caselaw interpreting policy language materially different than the language at issue here and relied on out-of-state cases and on cases that do not involve or concern claims for loss of business income and extra expense due to the necessary suspension of operations caused by physical loss or physical damage. While Cincinnati did rely on several foreign COVID-related cases concerning loss of business income claim, those cases fail to analyze the phrase "physical loss or physical damage" in accordance with standard Connecticut precepts of contract interpretation. In addition, Cincinnati's assertions of lack of factual allegations are inaccurate. As Farmington Village Dental Associates, LLC ("Farmington

1538418_1

Village" or "Plaintiff") shall show, using Connecticut rules of contract interpretation, a policyholder could reasonably interpret and expect "physical loss or physical damage" to mean the loss of use of tangible property that is not structurally altered.

The Complaint sets forth various factual allegations in support of its contention that SARS-CoV-2 likely was present on the subject premises, more than a "mere recital of the elements of a cause of action." Specifically, the Complaint alleges: (1) "Current science has shown how the virus attaches itself to surfaces and aerosols turning property into a virus incubator as crowds of people come and go" (Compl. ¶ 29); (2) "SARS-CoV-2 is a highly contagious virus that has rapidly spread and continues to spread across the United States" (*id.* ¶ 35); (3) "Public health authorities, including the CDC, have reported significant ongoing community spread of the virus including instances of community spread in all 50 states" (*id.* ¶ 36); (4) "The CDC has reported that a person can become infected and it is not known how or where they became exposed" (*id.* ¶ 37); (5) "SARS-CoV-2 has been transmitted by way of human contact with surfaces and items of physical property located at premises in Connecticut" (*id.* ¶ 40); (6) "SARS-CoV-2 has been transmitted by way of human contact with airborne SARS-CoV-2 particles emitted into the air at premises in Connecticut" (*id.* ¶ 41); and (7) "The incubation period for COVID-19 is at least 14 days. Current evidence shows that the first death from COVID-19 in the United States occurred as early as February 6, 2020 – weeks earlier than previously reported, suggesting that the virus has been circulated in the United States far longer than previously assumed." (*Id.* ¶ 48.) The Complaint goes on to allege: "It is likely patients, employees and/or other visitors to the insured property were infected with COVID-19 and thereby infected the insured property with COVID-19." (*Id.* ¶ 48.)

2

Therefore, it is clear, the allegations in the Complaint more than satisfy the plausibility standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679 (2009).

## I.   **<u>INTRODUCTION</u>**

The case presently before the Court involves the ongoing public health calamity caused by the COVID-19 pandemic. This pandemic and the deadly, insidious disease underlying it have brought life around the world to a virtual standstill as individuals and businesses everywhere make efforts to protect the lives of their friends, family members, and fellow members of their communities. Connecticut's story is not unusual though not all states took the same emergency measures or experienced the same timing of the spread of the pandemic.

The measures taken to protect human life in the face of this unprecedented disaster have not been without costs. Individuals have been forced to isolate themselves, work from home, and forgo visits with at-risk loved ones, even in the midst of the holiday season. Significantly, these orders were based on both facts and public health judgments.

The plaintiff, a dental practice in Connecticut, paid premiums for insurance to cover the losses from these types of fortuitous events. In addition to the alterations described above, the plaintiff has sustained accidental physical loss of its property as it has been forced to suspend operations due to the loss of use of tangible property that has not been structurally altered. The resulting loss of use of their property is a covered loss under the "all-risk" policy of insurance held with the defendant, Cincinnati, which provides coverage for any "accidental physical loss **<u>or</u>** accidental physical damage." (Emphasis added.)

Despite this broad grant of coverage, the defendant wrongfully denied coverage to the plaintiff on the ground that there had been no "physical damage" to the plaintiff's property.

1539753

There is no requirement in the policy that the plaintiff's business property sustain physical damage. To read it otherwise, makes "or" surplusage. As a result of the COVID-19 pandemic and ensuing governmental orders, it is undisputed that the plaintiff's business experienced a "loss of use" of tangible property. The Complaint describes the nature of the virus (e.g., it can be spread by asymptomatic individuals) and the historical nature of plaintiff's operations. The Complaint also alleges that it was most likely that SARS-CoV-2 was on the premises. These are plausible claims. As the loss falls within the broad grant of coverage, and no exclusion applies, the Court should deny the defendant's Motion to Dismiss in its entirety. Although policy interpretation is a question of law, discovery would show how the defendant explains the phrases in the policy to underwriters and claims adjusters, among others, and how they have acted in the face of other pandemics.

## I.    FACTUAL BACKGROUND

### A.    Farmington Village Dental Associates' Policy of Insurance.

The plaintiff is a dental practice that has operated for many years in Farmington. Compl. ¶ 2. To protect against losses due to interruptions in its business, the plaintiff purchased the subject insurance policy from the Cincinnati Insurance Company. Compl. ¶ 3. The plaintiff's policy is an "all-risk" policy of insurance. Compl. ¶ 18. All-risk policies of insurance exist to cover any risk imaginable, unless such risk is expressly excluded under the terms of the contract. *See, e.g.*, *Holmes v. Safeco Ins. Co. of Am.*, 171 Conn. App. 597, 604 (2017) ("[g]enerally, 'all-risk' policies cover all causes of loss unless they are expressly excluded"); *see also R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 171 Conn. App. 61, 89–90 (2017), *aff'd*, 333 Conn. 343 (2019) ("[s]ince one who speaks or writes, can by exactness of expression more

4

easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter"). Put another way, if the plaintiff suffers an accidental physical loss to its property due to an unprecedented public health emergency, that loss is covered unless there is some exclusion in the policy that applies.

The policy states:

**SECTION A. COVERAGE**

We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

*See* Policy, Doc. No. 1-1 at 25. The policy describes the meaning of "Covered Cause of Loss" as follows:

**a. Covered Causes of Loss**

Covered Causes of Loss means direct "loss" unless the "loss" is excluded or limited in this Coverage Part.

*Id.* at 27. The plaintiff's loss is neither excluded nor limited by the terms of the policy.

"**Loss**" is a term defined as follows: "'Loss' means accidental physical loss **or** accidental physical damage." *Id.* at 60 (emphasis added).

The policy at issue expressly provides coverage for the interruption of the plaintiff's business and any extra expense incurred as a result. *See id.* at 40–41, Sections E.b(1) ("Business Income") and E.b(2) ("Extra Expense"). Specifically, the policy provides:

**(1) Business Income**
We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.
. . . .

**(2) Extra Expense**
(a) We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs (2)(b), (c) and (d)) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

The defendant notes in its Memorandum of Law that "[u]nder Connecticut law proper insurance contract interpretation requires the Court to read the contract as a whole, consider all relevant portions together and give operative effect to every provision. *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 373 (2008)." *See* Doc. No. 13-1 at 7.

One reasonable interpretation is that "physical loss or physical damage includes "resulting loss of use". Looking at the policy "as a whole", it should be noted that "physical loss or physical damage" includes "resulting loss of use", which is how Cincinnati defines "property damage" in the Commercial General Liability Coverage Part Declarations (which is attached to and forming part of POLICY NUMBER: ECP 047 90 05). Cincinnati defines "**Property damage**" as:

> a.      Physical injury to tangible property, including all resulting **loss of use** of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b.      **Loss of use** of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*See* Policy, Doc. No. 1-1 at 140 (emphasis added). The policy further provides coverage for any losses of business income resulting from the action of a Civil Authority:

**(3) Civil Authority**
When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

6

(a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

(b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*See* Policy, Doc. No. 1-1 at 41, Section E.b(3) ("Civil Authority"). The policy provides

Additional Coverage for business interruption losses due to the prevention of ingress and egress

at the subject premises:

**e. Ingress and Egress**
We will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a "premises" shown in the Declarations due to direct "loss" by a Covered Cause of Loss at a location contiguous to such "premises". However, coverage does not apply if ingress or egress from the "premises" is prohibited by civil authority.

*See* Policy, Doc. No. 1-1 at 114, Section A.5.e ("Ingress and Egress").

**B.    Governmental Orders Issued in Response to the COVID-19 Pandemic.**

On March 10, 2020, Governor Ned Lamont issued declarations of public health and civil

preparedness emergencies. **Exhibit A**. In the months following these declarations, the Governor

issued a number of Executive Orders, beginning with Executive Order 7, dated March 12, 2020.

**Exhibit B**.[1] Among other things, Executive Order 7 prohibited all in-person gatherings of 250 or

more people.

---

[1]*See, e.g.*, *Murray v. Cuomo*, 460 F.Supp.3d 430, 446 (S.D.N.Y. May 16, 2020) ("Controlling the spread of the disease in order to contain the pandemic, minimize deaths, allocate scare hospital resources, and prevent a larger public health catastrophe (with its attendant other negative impacts on society) is a powerful compelling governmental interest."); *Lighthouse Fellowship Church v. Northam*, 462 F.Supp.3d 635, 648 (E.D. Va. May 21, 2020) (orders pursue the goal of slowing the spread of a deadly pandemic and saving lives); *Calvary Chapel of Bangor v. Mills*, 459 F.Supp.3d 273, 284 (D. Maine May 9, 2020) (governor's orders directed at limiting the spread of COVID-19 demonstrated a substantial relation to the interest of protecting public health); *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902–03 (Pa. Apr. 13, 2020) ("There is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest.").

1539753

On March 16, 2020, the Governor issued Executive Order 7D. **Exhibit C**. This Order noted that "the United States Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment of the virus and to slow transmission of the virus, including cancellation of gatherings of fifty people or more and social distancing in smaller gatherings." *Id.* at 2. In light of this, the Order modified down the limitation on gathering to 50 or fewer people. *Id.*

On March 20, 2020, the Governor entered Executive Order 7H, directing all residents in Connecticut to stay at home, imposing social distancing rules, limited occupancy of buildings, and reiterated that any entity that does not employ individuals to perform essential worker functions as set forth in guidance provided by the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA) shall adhere to limitations on social gatherings and social distancing set forth in the Order. **Exhibit D**. The purpose of the order was to mitigate and slow the spread of COVID-19 in the state. *Id.* at 2.

On March 26, 2020, the Governor issued a civil authority order, Executive Order 7N, limiting social gatherings of more than 5 people. **Exhibit E**. The purpose of the order was to mitigate and slow the spread of COVID-19 in the state. *Id.* at 2. On September 1, 2020, the Governor extended Connecticut's State of Emergency in response to the COVID-19 pandemic until February 9, 2021. **Exhibit F**.

On May 17, 2020, the Connecticut Department of Public Health announced guidelines for best practices for dental offices during the COVID-19 pandemic. **Exhibit G**. The Department noted that the Centers for Disease Control had recommended that that dental practices "postpone elective procedures, surgeries, and non-urgent dental visits, and prioritize urgent and emergency

visits and procedures due to the risk of COVID-19 infection in the community." *Id.* at 1. The Department observed that "[d]ental practices in Connecticut are bound by statutory language (CGS § 20-112(a)(15)) to adhere to CDC guidelines for infection control in dental care settings and all Occupational Health and Safety Administration (OSHA) requirements for safe workplaces." *Id.* The Department then set forth ten pages of guidance on physical and operational changes that should be made to dental practices to operate safely. *Id.* at 4–13. The Department advised that, "[g]iven current public health data that indicates continued significant risk for statewide community spread of COVID-19 infection, dental care practices that are not able to meet the guidelines listed here by May 20th are strongly advised to delay expansion of their operations beyond urgent care until they are able to meet these guidelines." *Id.* at 2.

On or about March 23, 2020, the plaintiff temporarily suspended non-emergent operations at its clinic. Compl. ¶ 7. Over the past several months, it has gradually reopened its practice to non-emergent patients. *Id.* ¶ 26. The reopening involved expensive precautions and protocols to protect patients, staff, and property. The plaintiff continues to suffer losses due to the COVID-19 pandemic, in the form of reduced patient visits as well as ongoing physical repairs to the property as recommended by the Department of Public Health, namely, daily sanitation of the premises and property and erection of physical barriers to protect patients and staff. *Id.* ¶ 52, 69, 78, 83. It is anticipated that these repairs will remain ongoing until the pandemic abates to the point at which the Governor, Department of Public Health, and other governmental and regulatory authorities advise that they are no longer needed. *Id.* ¶ 66, 67.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

## III.   LAW AND ARGUMENT

### A.   Standard on a Motion to Dismiss.

On a motion to dismiss under Rule 12(b)(6), the Court should "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Allison v. Round Table Inv. Mgmt. Co., LP*, 447 F. App'x 274, 275 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is <u>plausible</u> on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plaintiff need not plead all its evidence or convince the Court that it will ultimately prevail to succeed against the Motion to Dismiss.

### B.   The Policy Provides Coverage for "Accidental Physical Loss or Accidental Physical Damage" of Property, Which Has Occurred Here.

The Court should find that the policy at issue is unambiguous in its grant of coverage for the losses sustained by the plaintiff in this action. As noted above, by working through grant of coverage and definition of loss, which includes a plain reading of "accidental physical loss **or** accidental physical damage" of property, demonstrates that the plaintiff's losses are covered, and there are no exclusions that apply. This language is very broad and inclusive.

In the alternative, if the Court finds that the grant of coverage is ambiguous insofar as "physical loss" is not defined in the policy, the Court must resolve this ambiguity against the insurer as the drafter of the policy. *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38 (2014). The Connecticut Supreme Court has held "[a]s with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than

10

one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy

must be construed in favor of the insured because the insurance company drafted the policy."

*Karas v. Liberty Insurance Corp.*, 335 Conn. 62, 73–74 (2019) (quoting *Lexington Ins. Co. v.*

*Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38 (2014)); *see also Farrell v. Royal Ins.*

*Co. of America*, 989 F. Supp. 159, 162 (D. Conn. 1997) ("[i]f the insurance coverage is defined

in terms that are ambiguous, such ambiguity is . . . resolved against the insurance company");

*Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 583-84 (1990) (same). This

approach towards ambiguities has been endorsed multiple times by the Connecticut Supreme

Court. *See also Matzner v. Seaco Ins. Co.*, No. CIV. A. 96-0498-B, 9 Mass L. Rptr 41, 1998 WL

566658 (Mass. Super. Ct. Aug. 12, 1998). If Cincinnati wanted to define the phrase, it could

have done so. Obviously, it chose not to do it.

In either case, the Court should hold that the defendant breached its obligations under the

contract for insurance at issue by wrongfully issuing a denial of coverage. At a minimum, the

plaintiff's interpretation of the policy is certainly plausible under the circumstances as covering

the plaintiff's accidental physical loss. Accepting all factual allegations in the Complaint as true,

and drawing all reasonable inferences in the plaintiff's favor, it would not be appropriate, fair, or

just to dispense with the case at the motion to dismiss stage.

## 1.     The plaintiff has suffered a covered "accidental physical loss" of its property due to the COVID-19 pandemic.

As an initial matter, the use of the disjunctive "or" in the grant of coverage at issue here

means that "physical loss" must mean something other than "damage." The policy defines "loss"

as "accidental physical loss **or** accidental physical damage." *See* Policy, Doc. No. 1-1 at 60,

Section G.8 (emphasis added). Interpreting "physical loss" to mean "physical damage" would

render it superfluous, which is disfavored under Connecticut law. The Connecticut Supreme Court has held that "[i]f it is reasonably possible to do so, every provision of an insurance policy must be given operative effect . . . because parties ordinarily do not insert meaningless provisions in their agreements." *Ceci v. National Indem. Co.*, 225 Conn. 165, 175–76 (1993) (citations omitted; internal quotation marks omitted); *see also Viking Construction, Inc. v. 777 Residential, LLC*, 190 Conn. App. 245, 258 (2019) ("[an insurance] policy should not be interpreted so as to render any part of it superfluous" (quoting *R.T. Vanderbilt Co. v. Continental Casualty Co.*, 273 Conn. 448, 468 (2005))).

While Cincinnati has cited this Court to certain cases in which it is involved, it has not cited or distinguished other cases which are similar and in which the Courts have ruled against Cincinnati.

In one instance involving this same Cincinnati policy language, a Missouri federal district court noted the distinction between "accidental physical loss" and "accidental physical damage" in a pair of related decisions. At a minimum, "physical loss" in the context of these policies of insurance must mean something other than "physical damage." *See, e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) ("Here, the Policies provide coverage for 'accidental physical loss or accidental physical damage.' . . . Defendant conflates 'loss' and 'damage' in support of its requirement that the Policies require tangible, physical alteration."). *See also K C Hopps v. Cincinnati Ins. Co.*, No. 20-cv-00437-SRB, 2020 WL 6483108 (W.D. Mo. Aug. 12, 2020).

Because the policy does not define "physical," it is appropriate to look to the common, everyday understanding of that word in an attempt to evaluate its meaning within the policy.

*Atain Specialty Ins. Co. v. Hank's Dairy Bar, Inc.*, No. 3:19-CV-1085 (SRU), 2020 WL 3843688, at *3 (D. Conn. July 8, 2020) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)) (**Exhibit H**). The dictionary definition of policy terms may be of assistance in ascertaining their meaning in the context of the policy. *See id.* (referring to Merriam-Webster for definitions of various terms); *see also New London Cty. Mut. Ins. Co. v. Zachem*, 145 Conn. App. 160, 166 (2013) ("[t]o determine the common, natural, and ordinary meaning of an undefined term, it is proper to turn to the definition found in a dictionary").

Merriam-Webster defines "accidental" as meaning "occurring unexpectedly or by chance" or "happening without intent or through carelessness and often with unfortunate results." *Accidental*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/accidental (last visited Jan. 13, 2021). Merriam-Webster defines "physical" as meaning "having material existence: perceptible especially through the senses and subject to the laws of nature" and "of or relating to material things." *Physical*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/physical (last visited Jan. 13, 2021). Finally, Merriam-Webster defines "loss" as meaning "the act of losing possession : DEPRIVATION." *Loss*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/loss (last visited Jan. 13, 2021).

Considering the ordinary definitions of these terms, it is clear that the plaintiff has suffered an "accidental physical loss" of property. Specifically, due to the existence of a global health disaster, it has been deprived of its property in an actual, material, and perceptible way in that it was unable to use tangible property for its intended purpose, namely, running the plaintiff's business. Nothing in the ordinary meanings of these terms would require physical

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

damage to the property itself—it is apparent, based on the language used in the policy, that it anticipates coverage when a business, such as the plaintiff, loses the use of its property or cannot fully use it for its intended, insured purpose.

In *Studio 417, Inc.* and *K C Hopps*, the courts denied motions to dismiss filed by Cincinnati, rejecting its argument that the policy required "actual, tangible, permanent, physical alteration of the property." *See Studio 417*, No. 20-cv-03127-SRB, 2020 WL 4692385, at *4. The court held: "the Policies provide coverage for 'accidental physical loss *or* accidental physical damage,'" and stated that Cincinnati "conflates 'loss' and 'damage.'" *Id.*, at *5 (emphasis in original). Rejecting this argument, the court held that it "must give meaning to both terms." *Id.*

These decisions have been cited favorably by other courts confronting the same Cincinnati policy language. For instance, in *North State Deli, LLC v. The Cincinnati Insurance Company*, No. 20-CVS-02569 (N.C. Super. Ct. Oct. 9, 2020), the court denied Cincinnati's motion to dismiss (**Exhibit I**) and granted the plaintiff's motion for partial summary judgment on the issue of liability (**Exhibit J**). The court held that "the ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions." *Id.*, at *6. The court expressly rejected Cincinnati's argument that "physical loss" required "physical damage" to the property. *Id.* The court found that "'direct physical loss' describes the scenario where businessowners and their employees, customers, vendors, suppliers, and others lose the full range of rights and advantages of using or accessing their business property." *Id.*

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

There are additional decisions which have ruled against The Cincinnati Insurance

Company.[2]

The cases cited by Cincinnati in its Memorandum in Support of Its Motion to Dismiss are

not persuasive. Although the exact reasoning in these decisions varies, they share either a

reliance on specific state law (other than Connecticut law), a complete failure to engage in a

meaningful analysis of the use of the disjunctive "or" in the grant of coverage, or different

factual allegations. These decisions also do not endeavor to discern the meaning of "physical

loss," in the context of the more complete phrase "physical loss or physical damage,"[3] either by

making reference to other areas of the policy or to the common, everyday meaning of those

terms. Rather, these decisions, often in conclusory fashion, utterly conflate "physical loss" with

"physical damage," or they rely on state laws that advance such a requirement. *E.g.*, *Catlin*

*Dental, P.A. v. The Cincinnati Indem. Co.*, No. 20-CA-004555 (20th Cir. Fl. Dec. 11, 2020)

(relying on Florida law as requiring "physical damage" to insured property); *Promotional*

*Headwear International v. The Cincinnati Ins. Co.*, No. 20-cv-2211, 2020 WL 7078735 (D. Kan.

Dec. 3. 2020) (relying on existing Kansas case law equating "physical loss" with "physical

damage"); *4431, Inc. v. Cincinnati Ins. Co.*, No. 5:20-cv-04396, 2020 WL 7075318, at *10 (E.D.

Pa. December 3, 2020) (interpreting Pennsylvania law to impose requirement that "physical loss"

---

[2]*Chapparells Inc. v. Cincinnati Ins. Co.*, No. CV-2020-06-1704 (Ohio Ct. C.P. Summit Cnty. Oct. 21, 2020) (attached as **Exhibit K**); *Johansing Family Enter. LLC d/b/a Play It Again v. Cincinnati Specialty Underwriters Ins.*, No. A 2002349 (Ohio Ct. C.P. Hamilton Cnty. Jan. 7, 2021) (attached as **Exhibit L**); *Queens Tower Rest. Inc. d/b/a Primavista v. Cincinnati Fin. Corp.*, No. A 2001747 (Ohio Ct. C.P. Hamilton Cnty. Jan. 7, 2021) (attached as **Exhibit M**); *Francois, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-201416 (Ohio Ct. C.P. Lorain Cnty. Sept. 29, 2020) (**Exhibit N**).

[3]This is similar to the absence of analysis by the defendant in its Memorandum in Support of its Motion to Dismiss.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

result from "physical damage"); *T&E Chicago LLC v. The Cincinnati Ins. Co.*, No. 20C4001, 2020 WL 6801845, at *4 (N.D. Ill. Nov. 19, 2020) (citing Illinois state court decisions holding "loss to" to require a physical loss to the property itself); *Sandy Point Dental, P.C. v. The Cincinnati Insurance Company*, No. 20CV2160, 2020 WL 5630465 (N.D. Ill., Sept. 21, 2020) (equating "physical loss" with "physical damage" in conclusory fashion).

Courts that have engaged in a thorough, reasoned consideration of these terms have found that "physical loss" must mean something other than "physical damage." *E.g.*, *Studio 417*, No. 20-cv-03127-SRB, 2020 WL 4692385; *K C Hopps*, No. 20-cv-00437-SRB, 2020 WL 6483108; *North State Deli, LLC*, No. 20-CVS-02569; *see also* Part II.B.4, *infra*. This distinction between "physical loss" and "physical damage" is consistent with the way that other courts have analyzed the same question in policies issued in other contexts by other insurers. For instance, courts have held that contamination of the premises can result in "loss," even in the absence of physical damage. In *Motorist Mutual Insurance Company v. Hardinger*, 131 F. App'x 823 (3d Cir. 2005), the court held that bacterial contamination of a home water supply, even absent physical damage to the home, was a "direct physical loss to property" under the policy at issue because it meant the home could not be used for its intended purpose, as it was too dangerous to inhabit.

In another case involving water contamination, *Cooper v. Travelers Indemnity Company of Illinois*, No. C-01-2400-VRW, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002), a tavern closed due to E. coli contamination in its well water. The court held that this contamination amounted to "direct physical damage to the property" and found the insurer responsible for time element and extra expense incurred by the insured.

16

Courts have applied similar reasoning in asbestos cases. In *Sentinel Management Company v. Aetna Casualty Insurance Company*, 615 N.W. 2d 819 (Minn. 2000), the court considered a business interruption claim brought by an insured whose property was found to have asbestos. The court held that the insured did not need to present proof of airborne asbestos across every corner of the property to trigger its business interruption coverage. *Id.* at 826.

Akin to water contamination and asbestos cases, courts have held that the presence of gases or odors on a property, rendering it unusable for its intended purpose, can be a "physical loss" resulting in coverage, even in the absence of physical damage. In *Gregory Packaging, Inc. v. Travelers Property Casualty Co.*, No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014), the court held that the presence of ammonia gas in a manufacturing plant was a "direct physical loss" because it rendered the plant unsuitable for its intended purpose until the gas was remediated. In *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013), the court addressed a case in which a home was rendered uninhabitable due to the release of toxic gases from defective drywall. The court held that this was a "direct physical loss" of the property, because it could not be used for its intended purpose, irrespective of whether the home had been physically damaged. In *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968), the court held that the presence of gasoline saturation under and around a church, which had rendered it unsafe and uninhabitable, constituted a "direct physical loss within the meaning of that phrase" of the insured's policy.

The above line of case law was cited by Judge Underhill in *Yale University v. Cigna Ins. Co.*, 224 F. Supp. 2d 402 (D. Conn. 2002). In that case, Judge Underhill stated:

> [The insurer] also fails even to consider, let alone distinguish, the substantial body of case law in which a variety of contaminating conditions have been held to

constitute "physical loss of or damage to property." *See, e.g.*, *Matzner v. Seaco Ins. Co.*, 1998 WL 566658 (Mass. Super. Aug. 12, 1998) ("direct physical loss" was ambiguous, thus carbon monoxide contamination would come under definition); *Columbiaknit, Inc. v. Affiliated FM Ins.* Co., 1999 WL 619100 (D. Or. Aug. 4, 1999) (mildew contamination was direct physical loss) *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or. App.6, 858 P.2d 1332 (1993) (losses caused by odors from illegal methamphetamine cooking were direct physical loss); *Murray v. State Farm Fire & Cas. Co.*, 203 W. Va. 477, 509 S.E. 2d 1, 16-17 (1998) ("Losses covered by the [all risk] policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the property."); see also *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F. 3d 603 (2d Cir. 1996) (the event triggering coverage in the asbestos context is the contamination, not the mere presence of asbestos in the building's products). Thus, Yale has sustained its burden of demonstrating that it has suffered "physical loss of or damage to property" as required under the all risk policies for the presence of asbestos or lead contamination in its buildings.

Id., 413–14.

Other courts in a variety of other contexts have held that a loss does not need to result in physical damage to trigger coverage. For instance, in *Total Intermodal Services. v. Travelers Property Casualty Company of America*, No. CV17-04908, 2018 WL 3829767 (C.D. Cal. July 11, 2018), the court analyzed this question in the context of lost property. The court found that a similar insurance policy requirement of "direct physical loss of or damage to" provided coverage for "loss of use" of the covered property. That case involved property that was lost during shipment, but there was no allegation that it had been damaged. The court held that "loss of property contemplates that the property is misplaced and unrecoverable, without regard to whether it was damaged." *Id.*, at *3.

Courts also have found insurers responsible for civil authority coverage in the absence of physical damage. In *U.S. Airways v. Commonwealth Insurance Company*, No. 03-587, 2004 WL 1094684 (Va. Cir. Ct. May 14, 2004), *rev'd on other grounds sub. nom.*, *PMA Capital Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 374 (Va. 2006), the court considered a claim brought by an

airline under its business interruption coverage for losses sustained resulting from the closure of

National Airport during the September 11, 2001 terrorist attacks. The court held that actual

damage to the airline's property was not required for coverage under the civil authority provision

of its business interruption coverage. *Id.*

Courts similarly have found "direct physical loss" when property was rendered

uninhabitable due to the imminent risk of harm. *See, e.g.*, *Port Authority of New York & New

Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (holding that coverage for

physical loss or damage would apply if asbestos were released in the building "such that its

function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if

there exists an imminent threat of the release of a quantity of asbestos fibers that would cause

such loss of utility"); *Murray v. State Farm Fire and Cas. Co.*, 509 S.E. 2d 1, 17 (W. Va. 1998)

(holding that imminent risk of landslide rendered insured property "unusable or uninhabitable,

[and] may exist in the absence of structural damage to the insured property"); *Assurance Co. of

Am. v. BBB Serv. Co. Inc.*, 593 S.E.2d 7, 7–9 (Ga. App. Ct. 2003) (evacuation order closed

restaurant in face of hurricane); *Hughes v. Potomac Ins. Co.*, 199 Cal. App. 2d 239, 18 Cal. Rptr.

650 (1st Dist. 1962) (house imperiled by landslide but not structurally damaged, court stated:

"Despite the fact that a 'dwelling building' might be rendered completely useless to its owners,

[insurer] would deny that any loss or damage had occurred unless some tangible injury to the

physical structure itself could be detected. Common sense requires that a policy should not be so

interpreted in the absence of a provision specifically limiting coverage in this manner."),

*abrogated on other grounds*, *Sabella v. Wisler*, 59 Cal. 2d 21, 34, 377 P.2d 889 (1963);

*Manpower, Inc. v. Ins. Co. of the State of PA*, No. 08C0085, 2009 WL 3738099, at *5 (E.D.

Wisc., Nov. 3, 2009) (collapse of adjacent building rendered property physically inaccessible and insurer denied coverage. Court stated: "I reject ISOP's argument that a peril must physically damage property in order to cause a covered loss. As noted, the policy covered physical losses in addition to physical damage, and if a physical loss could not occur without physical damage, then the policy would contain surplus language. However, a contract must, where possible be interpreted so as to give reasonable meaning to each provision without rendering any portion superfluous. . . . Thus, 'direct physical loss' must mean something other than 'direct physical damage'.").

Courts also have applied similar principles in cases involving computer data and ransomware attacks, finding "direct physical loss" even in the absence of physical damage. *E.g.*, *National Ink and Stitch, LLC v. State Auto Prop. & Cas. Ins. Co.*, 435 F. Supp. 3d 679, 686 (D. Md. 2020) (holding loss of use of computer system in ransomware attack "demonstrate[d] the required damage to a computer system, consistent with the 'physical loss or damage to' language in the Policy"); *American Guar. & Liability Ins. Co. v. Ingram Micro, Inc.*, No. 99–185 TUC ACM, 2000 WL 726789 (D. Ariz. April 18, 2000) (computer system outage resulting in interruption of the plaintiff's business was a covered loss); *Southeast Mental Health Center, Inc. v. Pacific Ins. Co., LTD*, 439 F. Supp. 2d 831, 833–34 (W.D. Tenn. 2006) ("loss of access, loss of use, and loss of functionality" fall within the definition of "direct physical damage").

The common thread that runs through all of these cases is that the plaintiff only derives value from its property to the extent that it can be used for its intended business purpose. That said, businesses purchase all-risk insurance with potential interruptions to their business very much in mind. If they wished only to insure against "physical damage," they would not have

purchased and paid premiums on insurance that provided coverage for "physical loss of or physical damage"—and, to be sure, if insurance companies such as Cincinnati wished only to insure against "physical damage," they would not have drafted the policy to provide coverage for "physical loss."

As it stands, the COVID-19 pandemic has transformed the plaintiff's business location from a building into a potential viral incubator. Compl. ¶ 29. This is knowledge that is shared by the government, reflected in its extensive, ongoing efforts to reduce the congregation of individuals in indoor settings, as well as the public, reflected by people electing not to go forward with elective medical procedures, postponing unnecessary travel, and even celebrating the holidays away from friends and loved ones. Further, the ability of SARS-CoV-2 to remain airborne in respiratory droplets for hours after being expelled from a person; its potential ability to spread even through building ventilation systems; and its ability to remain potentially for *days* on surfaces all evidence its *physical* nature.[4] There is nothing abstract, ephemeral, or nonmaterial about SARS-CoV-2. The fact is that SARS-CoV-2 presently is *ubiquitous*, it is *physical*, and it creates an imminent risk of illness and death, all of which has resulted in the plaintiff's loss.

The plaintiff plausibly has alleged in its Complaint that, due to this ubiquitous nature of SARS-CoV-2 in the community, it is likely it also was present on the plaintiff's premises. Compl. ¶¶ 39–48. Further, there is an ongoing imminent risk of SARS-CoV-2 being present on the property. *Id.* Although the defendant seemingly attempts to trivialize this risk as

---

[4] *See, e.g.*, NATIONAL INSTITUTES OF HEALTH, "Study suggests new coronavirus may remain on surfaces for days" (Mar. 24, 2020), *available at* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days; CENTERS FOR DISEASE CONTROL, "Ventilation in Buildings" (last updated Dec. 21, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

unsubstantial or the harm to the plaintiff's business as illusory; *see* Doc. No. 13 at 15 ("Plaintiff in this action will argue the possibility of viral particles on its premises turns the existence of a pandemic into 'damage to property.' This proposition has no support in law, science, or logic."); neither of these things are true. The likely presence of a deadly disease on the plaintiff's property is not a small matter, particularly for a healthcare institution that is charged with safeguarding the wellbeing of the public. As the cases above demonstrate, there is an abundance of support for the proposition that, when a business property is rendered unusable for its intended purpose, the insured has incurred a "loss" to its property as contemplated in its insurance contract.

2.     **The Connecticut Supreme Court has not addressed whether "physical loss" requires physical damage to property.**

Contrary to the defendant's suggestion in its Memorandum of Law In Support of Its Motion to Dismiss, there is no Connecticut Supreme Court decision that discusses whether "accidental physical loss" requires physical damage to property. In *Capstone Building Corporation v. American Motorists Insurance Company*, 308 Conn. 760 (2013), cited by the defendant for this point, the Supreme Court interpreted a commercial general liability policy providing coverage for "bodily injury" or "property damage." *Id.* at 768. The Court did not discuss a grant of coverage for "physical loss." The Court noted that the policy at issue in that case defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* at 782. The Court held that, due to the policy's requirement of "physical injury" to trigger coverage for resulting "loss of use," the escape of carbon monoxide on the property without any accompanying "physical injury" was not covered. Obviously, this Decision does not apply to the present case, where the policy at issue does not require "physical injury." In quite the opposite circumstance, as detailed above, the policy at issue specifically uses

22

the disjunctive in its grant of coverage to provide coverage for *both* "physical loss" and "physical damage." The *Capstone* decision is of little assistance in the present case due to the differences in policy language.

Although the Supreme Court has not addressed whether "physical loss" requires physical damage to covered property to be considered a Covered Cause of Loss, the Court has issued opinions that are instructive in the present case, discussing coverage for potential "collapse" or "collapse" in the crumbling foundation context. In *Beach v. Middlesex Mutual Assurance Company*, 205 Conn. 246 (1987) and *Karas v. Liberty Mutual Insurance Corporation*, 335 Conn. 62 (2019), the Supreme Court determined that the word "collapse" in a homeowner's insurance policy is sufficiently ambiguous to include coverage for any "substantial impairment of structural integrity" of the insured's home and rejected the insurers' argument that collapse was limited to a catastrophic event involving a sudden and complete falling down or caving in of a building.

In both cases, the Court rejected the insurer's assertion that its interpretation was the only one consistent with the terms of the clause excluding liability for loss by "settling, cracking, shrinking, bulging or expansion." The Court in *Beach* held "although 'collapse' encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide the limited usage it now claims to have intended." *Beach*, 205 Conn. at 252. In *Karas*, the Court stated that "[i]ndeed, if the defendant had wished to limit its collapse coverage to a sudden and catastrophic event, it very easily could have done so in plain and inambiguous terms." *Karas*, 335 Conn. at 79.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

It is further worth noting that, in *Karas*, the insurer argued that it *had* changed the language used in its policies in response to the Supreme Court's decision in *Beach*. *Id.* at 80. Specifically, the insurer argued that it had used language identical to language used in a policy cited by the *Beach* court, arguing that the *Beach* court had cited to that policy language as an example of an unambiguous definition of "collapse." *Id.* Ultimately, the *Karas* Court did not agree that *Beach* had intended to reach that conclusion but agreed that there was not a "collapse" under the circumstances and within the terms of the policy. *Id.* at 80–81, 89. This shows that insurers know how to exclude specific perils from coverage when they so desire, and they will change policy language that is ambiguous to do so. In the present case, the defendant has not.

In *England v. Amica Mutual Insurance Company*, No. 3:16-CV-1951 (MPS), 2017 WL 3996394 (D. Conn. Sept. 11, 2017), the court addressed a similar cracked foundation claim as was present in *Beach* and *Karas*. The court granted the defendant's motion to dismiss after engaging on a detailed, thorough inquiry into the meaning of "collapse" as used in that policy. *Id.*, at *4–8. In that case, the court noted that the policy at issue specifically required an "abrupt" collapse. *Id.*, at *4. The court further noted that, in that particular policy, the term "loss" was used in a way akin to how it had been used in the *Capstone* case, namely, by requiring that the loss flow from some "physical damage" to the property to trigger coverage. *Id.*, at *7–8.

The other Connecticut decisions cited by the defendant similarly involved homeowner's policies with distinguishable grants of coverage,[5] and obviously not including additional coverages for business interruption and extra expense, as is the case here. *E.g.*, *Markland v. Homesite Ins. Co.*, No. CV16-6010323-S, 2018 WL 1734719, at *8 (Conn. Super. Ct. Mar. 6,

---

[5]Obviously, "physical loss" and "physical loss **or** physical damage" are very different.

2018) (homeowner's policy covering "physical loss to property"); *Mazzarella v. Amica Mut. Ins. Co.*, No. 17-CV-598, 2018 WL 780217, at *3 (D. Conn. Feb. 18, 2018) (homeowner's policy "insure[s] against direct physical loss to property"); *Liston-Smith v. CSAA Fire and Cas. Ins. Co.*, 287 F. Supp. 3d 153, 157 (D. Conn. 2017) (homeowner's policy "[w]e insure against risk of direct physical loss to property"); *Zamichiei v. CSAA Fire + Cas. Co.*, No. 3:16-cv-739 (VAB), 2018 WL 950116 (D. Conn. Feb. 20, 2018) (homeowner's policy, "[w]e insure against risk of direct physical loss to property").

At most, the *England* case demonstrates how fact-intensive insurance coverage claims are. They are driven by the policy language at issue. Indeed, the impact of variations in policy language and state laws on the subject coverage issues were the principal grounds on which the Judicial Panel on Multidistrict Litigation recently denied motions for centralization seeking to create a national MDL for COVID-19 litigation. *See In Re: COVID-19 Business Interruption Protection Insurance Litigation*, MDL No. 2942, Doc. No. 772 at 3 (U.S. Jud. Panel Multidist. Litig. Aug. 12, 2020) (**Exhibit O**) ("While the policy language for business income and civil authority coverages may be very similar among the policies, seemingly minor differences in policy language could have significant impact on the scope of coverage."). In fact, in the MDL proceedings, Cincinnati stated that its position was "[i]n accordance with the arguments made in the Brief of Westchester Surplus Lines Insurance Company and Indemnity Insurance Company of North America, Cincinnati opposes Multidistrict transfer and consolidation . . . ." *See* **Exhibit P** at 2. Westchester Surplus Lines Insurance Company and Indemnity Insurance Company of North America in their brief at page 2 and 3 stated:

> MDLs involving multiple defendants are rare. MDLs formed to resolve insurance coverage cases against multiple defendants are even rarer. And MDLs in which no

defendant is a party to more than a small percentage of cases are unprecedented. The cases movants seek to consolidate here show why. They involve insurance contract disputes with more than 100 different insurers that issued different individually underwritten policies with different wording to different policyholders with different businesses—ranging from restaurants, to nightclubs, to dental practices, to marketing firms—that were affected differently by different "stay at home" orders issued by different governmental authorities in different jurisdictions. Each plaintiff asserts claims only against the insurer that issued that plaintiff's policy. Aside from plaintiffs purporting to sue two or more defendants in the same insurance group on the same policy, there are no multi-defendant actions. Most insurers, like Westchester and IINA, are a defendant to no more than two of the more than 130 actions. Even within the policies issued by a single insurer, there are different terms, conditions, exclusions and endorsements—some that contain a "virus exclusion" and some that contain other terms and exclusions that may apply to claims related to COVID-19. And, contrary to movants' assertion, the resolution of the different plaintiffs' insurance coverage claims under each individually underwritten and separately issued policy will require a series of individualized assessments based on the specific language of each policy as applied to the facts unique to each policyholder under the insurance laws of each state. Even many plaintiffs agree: more than 50 have said so in response to the Motions, vehemently opposing an MDL.

Transfer would not promote efficiency or conserve resources. It would uproot localized disputes, complicate rather than simplify discovery, prolong rather than streamline pretrial proceedings, and create one massive docket that could not conceivably be managed efficiently or effectively by a single federal judge. These cases do not satisfy the standards for an MDL.

*See* **Exhibit Q** at 2–3 (footnotes omitted). Yet, the defendant has engaged in providing this Court

with multiple string cites, without analysis of policy language.

No Connecticut court has determined whether "accidental physical loss or accidental

physical damage," as used in the subject policy of insurance, requires structural alteration or

damage as the defendant alleges.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

3.   **Cincinnati's argument that "physical loss or physical damage" unambiguously excludes loss of use of tangible property that is not physically altered is based upon decisions interpreting materially different policy language.**

Throughout its supporting Memorandum of Law, Cincinnati refers this Court to case law for the proposition that "physical loss" requires physical alteration to covered property. However, Cincinnati's assertion regarding the case law is misleading because those decisions generally construe the phrase "physical loss" rather than "physical loss or physical damage" and are not relevant to the Cincinnati policy language at issue here. The use of the disjunctive "or," which appears in the Cincinnati policy, makes a material difference in interpretation. In its policy, Cincinnati did not define "physical loss." The plaintiff's policy language is clear. If one were to argue that it is subject to interpretation, we know one thing that it cannot mean: it cannot mean "physical damage" because Cincinnati has specifically distinguished "physical loss" from "physical damage" by use of the disjunctive "or." Despite this obvious distinction, Cincinnati contends that the policyholder may not reasonably interpret "physical loss" to be something other than "physical damage" and has asked this Court to conclude the same.

From the very inception of its argument, Cincinnati cites to cases containing materially different policy language in support of its proposition that "physical loss or physical damage" does not reasonably include loss of use of tangible property that is not physically altered.

In the first sentence of its lead argument, Cincinnati stated: "Connecticut, like most jurisdictions, construes direct physical loss or damage to require actual alteration or change to property. *See, e.g.*, *Capstone BLDG. Corp. v. Am Motorists Ins. Co.*, 308 Conn. 760, 782 (2013); *England v. Amica Mut. Ins. Co.*, No. 3:16 CV 1951 (MPS), 2017 WL 3996394, at *7–8 (D. Conn. Sept. 11, 2017)." Doc. No. 13-1 at 8. As discussed above, neither *Capstone* nor *England*

27

involve policy language or allegations similar to those at issue here. Neither case supports Cincinnati's assertions.

Cincinnati then makes the same claim with respect to Second Circuit law. Cincinnati stated: "The Second Circuit Court of Appeals also requires an alteration or change and does not afford coverage for intangible economic losses. *See City of Burlington v. Indemnity Ins. Co. of N. Am.*, 332 F.3d 38, 44 (2d. Cir. 2003); *see also Lissauer v. The Fireman's Fund Ins. Companies*, 459 F. App'x 67, 68 (2d. Cir. 2012)." *Id.* The *City of Burlington* case concerned whether a defective part that had not yet failed was a covered loss. And in *Lissauer,* the policyholder sought coverage for losses incurred as an investor under the Madoff Ponzi scheme under a homeowner's policy that covered "direct physical loss of property" not "physical loss <u>or</u> physical damage". Once again, neither case is helpful in deciding the issues in this case.

Cincinnati includes a long quote from *England*, a case that interprets different policy language and does not even make a claim for loss of use of the property. Doc. No. 13-1 at 9.

Cincinnati also cites *Best Friends*, again a case involving completely different policy language. *Id.* at 9–10. That case involved the definition of property insurance as used in a waiver of subrogation provision. *Best Friends Pet Care, Inc. v. Design Learned, Inc.*, 77 Conn. App. 167, 181 (2003).

Cincinnati refers to the *Hurlburt v. Homeside Ins. Co.*, 310 F. Supp. 333 (D. Conn. 2018) and states: "Moreover, this Court has expressly rejected the proposition that a defective condition is a direct physical loss where there is no physical damage or alteration to property." Doc. No. 13-1 at 10. In support of that statement, Cincinnati cites to nine (9) crumbling foundation cases

28

interpreting *homeowner's* policies with policy language materially different than that at issue here. Those cases interpret "physical loss," not "physical loss <u>or</u> physical damage."

Cincinnati's entire lead argument, at pages 8–11, fails to cite to a single decision construing the policy language at issue in this case.

In Part II.C of Cincinnati's supporting Memorandum, Cincinnati titles the subsection "Connecticut Authority Is To The Same Effect As The Prevailing Law Nationally" and continues its misleading assertions. Doc. No. 13-1 at 11. The first sentence of that section states: "Connecticut is consistent with the prevailing view nationally. *See, e.g.*, 10A *Couch* §148:46 ('The requirement that the loss be 'physical,' given the ordinary definition of that term ***is widely held*** to exclude losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.') (Emphasis added)." Document No. 13-1 at 11–12. What Cincinnati fails to reveal, however, that the assertion in *Couch* is <u>not</u> based upon the interpretation of "direct physical loss or physical damage" to covered property. *Couch* is discussing cases interpretating the phase "physical loss" and not "physical loss or physical damage," where the use of the disjunctive "or" mandates that "physical loss" cannot mean "physical damage".

> ### 4.    Courts have held that business interruption losses due to COVID-19 are covered as a "direct physical loss" under similar policies of insurance.

Courts across the country have been responding to business interruption claims resulting from COVID-19 related losses over the past several months. As would be expected, these decisions reach a variety of results, as they turn on the application of distinct state laws as well as

the exact wording of the grants of coverage and exclusions at issue. However, when the facts of these cases have been similar to those in the present case, e.g., a policy providing coverage for "physical loss or physical damage" without any exclusions that clearly operate to bar coverage, courts frequently have rule in favor of the insured.

In *Blue Springs Dental Care, LLC v. Owners Inc.*, No. 20-cv-00583-SRB, 2020 WL 5637963 (W.D. Mo. Sept. 21, 2020), the court addressed a factual circumstance similar to the one at bar, involving a dental practice that temporarily suspended its normal operations in light of the health and safety risks posed by COVID-19. The court found that the plaintiff had alleged an adequate "physical loss" to trigger coverage in that case. *Id.*, at *4. The court noted that the plaintiff had alleged "it is likely customers, employees, and/or other visitors to the insured properties over the recent month were infected with the coronavirus," that the dental practice had "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus and the physical harm it could cause persons present there," and finally that "customers cannot access the property due to the Stay at Home Orders or fear of being infected with or spreading COVID-19." *Id.*

In *Perry Street Brewing Company, LLC v. Mutual of Enumclaw Insurance Co.*, No. 20-2-02212-32 (Wash. Super. Ct. Nov. 23, 2020) (**Exhibit R**), the court denied the insurer's motion to dismiss a complaint alleging claims made under a policy providing coverage for "direct physical loss of or damage to" covered property. *Id.* ¶ 14. The court noted that, when a policy does not define a term, it is appropriate to rely on that term's "plain, ordinary, and popular meaning." *Id.* ¶ 24. The court noted that dictionary definitions of "loss" included "deprivation." *Id.* ¶ 26. The court held that the plaintiff had pleaded "one reasonable interpretation" of "direct physical loss

1539753

of" property, namely, that the plaintiff "suffered a loss of its property because it was deprived from using it" and that the property "could not physically be used for its intended purpose." *Id.* ¶ 30.

In *Elegant Massage, LLC v. State Farm Mutual Automobile Insurance Co.*, No. 2:20-CV-265, 2020 WL 7249624 (E.D. Va. Dec. 9, 2020), the district court denied a motion to dismiss on the ground that the plaintiff's loss of use of its property due to COVID-19 was a covered loss. The court held that "'direct physical loss' has been subject to a spectrum of interpretations in Virginia on a case-by-case basis, ranging from direct tangible destruction of the covered property to impacts from intangible noxious gasses or toxic air particles that make the property uninhabitable or dangerous to use." *Id.*, at *8. The court concluded that "it is plausible that a fortuitous "direct physical loss" could mean that the property is uninhabitable, inaccessible, or dangerous to use because of intangible, or non-structural, sources." *Id.*, at *10.

A number of other recent decisions similarly have held that business interruption losses due to the COVID-19 pandemic may constitute a "direct physical loss" of covered property. E.g., *Hill and Stout PLLC v. Mutual of Enumclaw Insurance Co.*, No. 20-2-07925-1 (Wash. Super. Ct. Nov. 13, 2020) (**Exhibit S**) ("In applying the ordinary meaning of 'deprivation,' the Court finds that the Plaintiff's position that the dental practice had a 'direct physical deprivation' of its property when they were unable to see patients and practice dentistry is a reasonable interpretation by the average lay person."); *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co., Ltd.*, No. 620CV1174ORL22EJK, 2020 WL 5939172, at *4 (M.D. Fla. Sept. 24, 2020) (denying motion to dismiss in an action involving a policy with a virus exclusion); *Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*, No. 00375 (Pa. Ct. Com. Pl. Oct.

26, 2020) (denying motion to dismiss and noting that "the law and facts are rapidly evolving in the area of COVID-19 related business losses") (**Exhibit T**).

In view of the language of the policy in the present case, the reasonable expectations of Connecticut insureds, and considered against the backdrop of cases nationwide that, in analyzing the impact of the use of the disjunctive "or" in the grant of coverage, recognize that an insured may experience a "physical loss" even without "physical damage," the Court should find that the plaintiff's policy provides coverage for its business losses related to the COVID-19 pandemic. At the very least, the Court should hold that the defendant has failed to meet its burden on a Rule 12(b)(6) motion that there is not even a *plausible* claim for relief in the Complaint. While the plaintiff maintains its claims are clear and meritorious, they at least meet the burden of being plausible. The plausibility threshold is such that it presents the opportunity for discovery into policy language, underwriting, and claims handling which should be of assistance to the Court on the merits.

> **5.**      **The plaintiff is entitled to coverage for its loss of Business Income and Extra Expense incurred, because it suffered a suspension of its operations due an accidental physical loss of its property, and the period of restoration is ongoing.**

There can be no dispute in the present case that the plaintiff suffered a "suspension" of its "operations" and has incurred Extra Expense during the "period of restoration" as set forth in the Policy. "Suspension" is defined in the policy as "a. The slowdown or cessation of your business activities; and b. That a part or all of the 'premises' is rendered untenantable." *See* Policy, Doc. No. 1-1 at 62, Section G.19. "Operations" means "a. Your business activities occurring at the 'premises'; and b. The tenant ability of the 'premises', if coverage for 'Business Income' including 'Rental Value' or 'Rental Value' applies. *Id.* at 60, Section G.10. Finally, "period of

restoration" means "the period of time that: a. Begins at the time of direct 'loss'. b. Ends on the earlier of: (1) The date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location." *Id.* at 60–61, Section G.11.

As set forth above, the plaintiff suffered a slowdown or cessation of its business due to government orders related to stemming the spread of COVID-19, and the building was rendered untenantable due to the actual or imminent risk presented by COVID-19. This direct loss started when the plaintiff temporarily suspended the normal operation of its practice in response to the pandemic and governmental orders set forth above. As discussed, this loss is continuing, and "repairs" to the property also are ongoing in the form of heightened measures to clean the property, sterilize equipment, erect physical barriers, and maintain a safe patient environment despite the ongoing presence of COVID-19 in the community. The covered property will be repaired, and the use of the property will be restored, when the cause of the impairment has been remedied. In the case of a pandemic, the covered property is "repaired" by means of quarantine, herd immunity, vaccines, and community-based measures taken to curb the spread of disease. The period of restoration ends when the physical loss of use has been remedied.

The plaintiff's reading of the "period of restoration" and "repair, rebuilt or replaced" is in accordance with the common and everyday use of those terms. The common meaning of the verb "repair" includes "to restore to a sound or healthy state." *Repair*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/repair (last visited Jan. 13, 2021). The common meaning of the verb "rebuild" includes "to restore to a previous state." *Rebuild*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/rebuild (last

visited Jan. 13, 2021). The common meaning of "restoration" includes "a bringing back to a former position or condition" and "a restoring to an unimpaired or improved condition." *Restoration*, MERRIAM-WEBSTER DICTIONARY, https://merriam-webster.com/dictionary/restoriation (last visited Jan. 13, 2021).

The court in *Blue Springs Dental Care, LLC v. Owners Inc.*, No. 20-cv-00583-SRB, 2020 WL 5637963 (W.D. Mo. Sept. 21, 2020) endorsed this interpretation of "period of restoration" in a case also involving a dental clinic that was forced to temporarily suspend its normal operations in response to the COVID-19 pandemic. The court held that the plaintiffs "plausibly allege their dental clinics ceased operations, entirely or in part, 'on or about March 17, 2020, and have remained at that limited operational capacity through the date of this Complaint.'" *Id.*, at *6.

All that is necessary is that the plaintiff's interpretation be *reasonable*. The definitions of the above terms are consistent with the plaintiff's position that it has suffered a covered loss under the policy. It is *irrelevant* if the insurer can advance a different interpretation, even if it also is reasonable—at most, that would mean that the terms are ambiguous, and any such ambiguity must be resolved against the insurer and in favor of coverage. *Farrell v. Royal Ins. Co. of Am.*, 989 F. Supp. 159, 162 (D. Conn. 1997) ("[i]f the insurance coverage is defined in terms that are ambiguous, such ambiguity is . . . resolved against the insurance company"); *Karas v. Liberty Insurance Corp.*, 335 Conn. 62, 73–74 (2019) ("[a]s with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy."); *Lexington Ins. Co. v. Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38 (2014) (same).

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

In *Atain Specialty Ins. Co. v. Hank's Dairy Bar, Inc.*, No. 3:19-CV-1085 (SRU), 2020 WL 3843688 (D. Conn. July 8, 2020), the court addressed a question of insurance policy interpretation in which the disputed terms were not defined in the policy itself. *Id.*, at \*2. The court observed that, "[w]here a provision contains no definition of a disputed term, a court should consider the ordinary, common-sense meaning of the words." *Id.*, at \*3. To assist in construing the terms, the court referenced both Black's Law Dictionary and Merriam-Webster Dictionary. *Id.* The court noted that, "[t]o the extent that the policy terms are ambiguous, a court must construe ambiguities in favor of the insured because the insurance company drafted the policy. . . . A provision in an insurance policy is ambiguous if it is reasonably susceptible to more than one reading." *Id.*, at \*2. Reading the disputed terms in the context of the entire policy, the court concluded that they were ambiguous. *Id.*, at \*2–3.

As in *Atain Specialty*, if the Court finds that the terms above are reasonably susceptible to more than one reading, it should conclude that the terms are ambiguous. The plaintiff submits, as detailed above, that the terms *are not* ambiguous and plainly on their face grant coverage in these circumstances. However, to the extent there is any doubt regarding their meaning in this context, under *Atain Specialty* and related cases, the plaintiff certainly has advanced a reasonable interpretation of the terms—and that is all that is required to determine that the policy should be construed to grant coverage in this case and to deny the defendant's Rule 12(b)(6) Motion.

> **6.    The plaintiff's Complaint alleges a plausible claim for coverage under the Civil Authority provision.**

The plaintiff's Complaint includes several allegations related to the application of the Civil Authority provision. The plaintiff alleges that the pandemic, "which prompted CDC guidance, American Dental Association guidance, Connecticut State Dental Association

1539753

guidance, together with the stay at home orders contained within Governor Lamont's Executive Orders with the lack of availability of PPE combined to effectively cause the suspension of ordinary business operations." Compl. ¶ 63. The Complaint alleges that the orders contributed to the suspension of the plaintiff's ordinary business operations, as discussed above. *Id.* ¶ 57. In response, the defendant essentially repeats its arguments made elsewhere in the Motion, namely, "[j]ust as Coronavirus is not causing direct physical loss or damage to the Plaintiff's property, it is not causing direct physical loss or damage to other property." Doc. No. 13-1 at 25–26.

The Court should reject the defendant's arguments for the same reasons as above, namely, because the plaintiff has alleged "physical loss" in that SARS-CoV-2 is a physical substance; that it causes real and physical damage; and that it likely was present in the community, including the immediate vicinity to the plaintiff's business. Compl. ¶¶ 28, 48, 67–68. The plaintiff has alleged that, due to the physical loss caused by SARS-CoV-2, the governmental orders at issue forced the plaintiff to suspend its ordinary business operations. *Id.*

The defendant's argument also wrongly assumes that the phrase "prohibits access" to has a certain, unambiguous meaning, when in fact it is open to interpretation. Merriam-Webster defines "prohibit" as "to forbid by authority : ENJOIN" or "to prevent from doing something." *Prohibit*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/prohibit (last visited Jan. 13, 2021). It defines "access" as "permission, liberty, or ability to enter, approach, or pass to and from a place or to approach or communicate with a person or thing" or "freedom or ability to obtain or make use of something." *Access*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/access (last visited Jan. 13, 2021).

36

Certainly, the government's orders restricting individuals from gathering, coupled with the American Dental Association guidance and Connecticut State Dental Association guidance finding that best practices called for the necessary suspension of elective dental procedures, acted to "prevent" the plaintiff its ordinary "freedom or ability" to make use of its property as it normally would. The plaintiff acted in the only way that would have been appropriate for a licensed dental practice to act under the circumstances, given the government orders and the actions taken by relevant regulatory authorities. Essentially, the defendant is inserting words into the policy that are not there, suggesting that "prohibits access" should be held to mean, unambiguously, "prohibits *any form of physical entry*." That is not what the policy says.

Although Connecticut courts have not ruled on this issue, the plaintiff has advanced a plausible interpretation of the policy language that is sufficient to survive a Motion to Dismiss. In *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020), the court considered a COVID-19 related Civil Authority claim brought against Cincinnati involving the same policy language. Cincinnati moved to dismiss, in a nearly identical motion, filed by the same law firm that is representing the defendant in the present case. The court denied the defendant's motion to dismiss in that case, holding:

> At the motion to dismiss stage, these allegations plausibly allege that access was prohibited to such a degree as to trigger the civil authority coverage. . . . This is particularly true insofar as the [p]olicies require that the "civil authority prohibits access," but does not specify "all access" or "any access" to the premises. For these reasons, [p]laintiffs have adequately stated a claim for civil authority coverage.

*Id.*, at *7 (citation omitted). As in *Studio 417*, the plaintiff has at least advanced a plausible allegation that normal "access" to its property was "prohibited" or "prevented" due to the

37

operation of the action of a civil authority within the meaning of its policy. For this reason alone, the defendant's Motion to Dismiss the plaintiff's Civil Authority claim should be denied.

### C.   The Complaint States a Sufficient Claim under CUTPA/CUIPA and for Breach of the Covenant of Good Faith and Fair Dealing.

The defendant, in conclusory fashion and without making reference to the Complaint, states that the plaintiff "fails to set forth any facts establishing the required elements of a bad faith or unfair insurance practices claim." Doc. No. 13-1 at 29–30. This is simply incorrect. The Complaint includes *over four pages* of allegations of actionable bad-faith insurance practices. *See* Compl. at 19–24. The plaintiff alleges, *inter alia*, that the defendant used a predetermined decision not to cover any claim, failed to inquire into relevant facts before making a coverage decision, failing to follow appropriate claims-handling procedures, and failed to make good-faith efforts to resolve the plaintiff's claims, in keeping with its contractual duties to do so. *Id.* ¶ 99.

The plaintiff has alleged that this practice was part of a general business practice in handling pandemic claims, including "refusing to pay claims without conducting a reasonable investigation based upon all available information, failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability is reasonably clear, and compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amount ultimately recovered in actions brought by such insureds." *Id.* ¶ 102.

The plaintiff identifies that at the defendant has been accused of these same bad-faith practices with respect to pandemic-related claims of loss by at least fourteen other policyholders. *Id.* ¶ 103. The plaintiff further alleges that the defendant, in "its April 27, 2020 10-Q report, told investors that it will not honor business interruption claims connected to the COVID-19 virus

and has a predetermined strategy to deny all COVID-19 related claims." *Id.* ¶ 104. The plaintiff also details the allegations that these other insureds have made against the defendant, which mirror those detailed above. *Id.* ¶ 105.

Clearly, the plaintiff has set forth detailed, specific allegations of wrongful, bad-faith insurance practices, involving multiple other insureds and other claims, that would support a claim for breach of the covenant of good faith and fair dealing, as well as violations of CUTPA and CUIPA. *See, e.g.*, *RAMS II, LLC v. Massachusetts Bay Ins. Co.*, No. CV136043177S, 2016 WL 3266084, at *4 (Conn. Super. Ct. May 23, 2016) (permitting CUTPA/CUIPA claim where the plaintiff "alleged conduct defined as unfair claim settlement practices that were frequently committed and a general practice of the defendants").

### D.       There Are No Exclusions That Operate to Preclude Coverage of the Plaintiff's Claim.

In view of the clear grant of coverage detailed above, the plaintiff's claims come within the policy, and there is no exclusion that would operate to change that outcome.

#### 1.       The Governmental Action exclusion does not apply.

First, to the extent that there is an exclusion for "Governmental Action" under the policy, under Section A.3(b)(1)(c), that exclusion only operates when there is "[s]eizure or destruction of property by order of governmental authority." *See* Policy, Doc. No. 1-1 at 28.

Merriam-Webster defines "seizure" as "the act, action, or process of seizing" or "the taking possession of person or property by legal process." *See Seizure*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/seizure (last visited Jan. 13, 2021). There can be no dispute in the present case that the government, although issuing a number of orders related to the pandemic, has not taken possession of the plaintiff's property by legal

process. Similarly, the plaintiff's property has not been "destroyed" as that word is commonly understood. *See Destroy*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/destroy (last visited Jan. 13, 2021). Therefore, under any reasonable interpretation of the policy language, the Governmental Action exclusion does not apply.

### 2.     The policy does not have a virus exclusion.

Finally, it is worth noting specifically that the plaintiff's policy does not have a virus exclusion, in any form. Virus exclusions are commonplace amongst all-risk policies of insurance, and viral contamination is a known risk to insurers selling these policies, particularly to dental practices and other medical offices. It is fair for the plaintiff, presented with a market of insurance policies that often explicitly exclude coverage for viruses, to expect that a policy without such an exclusion *does* provide coverage for viruses. Likewise, Cincinnati's conscious decision not to use a virus exclusion should be taken as a strong indication that it was willing to assume the risk of providing coverage for viruses in exchange for the premiums it received for selling these policies.

## IV.   CONCLUSION AND RELIEF REQUESTED

For all the above reasons, the plaintiff respectfully submits that the Court should deny the defendant's Motion to Dismiss (Doc. No. 13).

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

THE PLAINTIFF,
FARMINGTON VILLAGE DENTAL
ASSOCIATES, LLC


BY:    */s/ R. Cornelius Danaher, Jr. (ct5350)*
       R. Cornelius Danaher, Jr. (ct5350)
       Calum B. Anderson (ct07611)
       Thomas N. Lyons, III (ct26937)
       DANAHERLAGNESE, PC
       21 Oak Street, Suite 700
       Hartford, Connecticut 06106
       Telephone: 860-247-3666
       Fax: 860-547-1321
       Email: ndanaher@danaherlagnese.com
              canderson@danaherlagnese.com
              tlyons@danaherlagnese.com


J. Tucker Merrigan
SWEENEY MERRIGAN LAW, LLP
268 Summer Street, LL
Boston, MA 02210
Telephone: 617-391-9001

Allan Kanner
Cynthia St. Amant
KANNER & WHITNEY, LLC
701 Camp Street
New Orleans, LA 70130
Telephone: 504-524-5777

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

## CERTIFICATION

I hereby certify that on January 14, 2021 a copy of the foregoing, was filed electronically and served by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*R. Cornelius Danaher, Jr. (ct5350)*
R. Cornelius Danaher, Jr., Esq.

1539753

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666