## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FARMINGTON VILLAGE DENTAL ASSOCIATES, LLC,<br>*Plaintiff,*<br><br>v.<br><br>CINCINNATI INSURANCE COMPANY,<br>*Defendant.* | No. 3:20-cv-01647 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Farmington Village Dental Associates, LLC ("Farmington" or "Plaintiff") has sued

Cincinnati Insurance Company ("Cincinnati" or "Defendant") for Cincinnati's alleged refusal to

pay Farmington for losses suffered due to the COVID-19 Pandemic. Compl., ECF No. 1 (Oct.

30, 2020).

Cincinnati has moved to dismiss the Complaint in its entirety. Def. the Cincinnati Ins.

Co.'s Mot. to Dismiss, ECF No. 13 (Dec. 18, 2020) ("Def. Mot.").

For the reasons stated below, Defendant's motion to dismiss is **GRANTED.**

To the extent something more than the presence of COVID-19 alone can be alleged as a

loss and a basis for insurance coverage, Farmington may file an Amended Complaint by **August

20, 2021**. If they cannot do so by this date, the dismissal of this Complaint will be with prejudice.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

On or around March 22, 2018, "Cincinnati [allegedly] issued Policy No. ECPCP 047 90

05 to [Farmington], for a policy period of March 22, 2018 to March 22, 2021," "[i]n return of the

payment of a premium."  Compl. ¶ 14; *see* Policy No. ECPCP 047 90 05, Ex. A to Compl., ECF No. 1-1 (Oct. 30, 2020) (the "Policy").

"SARS-CoV-2 [or "COVID-19"] is [allegedly] a highly contagious virus that has rapidly spread and continues to spread across the United States." Compl. ¶ 35. "The presence of any SARS-CoV-2 particles [allegedly] renders items of physical property unsafe and the premises unsafe[, and] . . . impairs value, usefulness and/or normal function." *Id.* ¶¶ 42-43. "The [alleged] imminent threat of SARS-CoV-2 particles on physical property [allegedly] impairs value, usefulness and/or normal function." *Id.* ¶ 44. Furthermore, the "presence" and alleged "imminent threat of particles of SARS-CoV-2 particles [allegedly] causes direct physical harm, direct physical damage, and direct physical loss to property." *Id.* ¶¶ 45-46.

"The effects of COVID-19 have resulted in the World Health Organization declaring the existence of a Pandemic. The Pandemic is a public health crisis that has [allegedly] profoundly impacted American society, [allegedly] including the public's ability to safely obtain dental care." *Id.* ¶¶ 50-51.

Farmington allegedly "suffered direct loss from the probable presence of a deadly virus that also damages property; or the imminent risk of such on-site contamination; or government orders limiting the use of Plaintiff's property; and stay at home orders or some combination of the foregoing." *Id.* ¶ 20. The Policy allegedly "require[s,] in the event of a loss[,] that the policyholder take all reasonable steps to protect the Covered Property from further covered damages, and keep a record of the expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." *Id.* ¶ 33. Farmington allegedly "submitted a notice of loss to [Cincinnati] under the Policy due to the probable presence of SARS-CoV-2 and the

COVID-19 Pandemic," and Cincinnati allegedly "denied those claims by letter dated April 27, 2020." *Id.* ¶ 70.

This dispute stems from the parties' interpretations of the "Business Income, Extra Expense, Civil Authority, Ingress and Egress and Sue and Labor provisions" of the Policy. *Id.* ¶ 34. These clauses and their respective definitions are as follows.

### i.   Definitions

Importantly, the Policy provides the following definitions for key terms:

"'Covered Causes of Loss' means direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." Policy, Building & Personal Property Coverage Form, at 5 § A(3)(a).[1]

"'Business Income' means the: a) Net Income (net profit or loss before income taxes) that would have been earned or incurred; and b) Continuing normal operating expenses sustained, including payroll." *Id.* at 38 § G(2).

"'Loss' means accidental physical loss or accidental physical damage." *Id.* at 38 § G(8).

> "Period of restoration" means the period of time that: a) Begins at the time of direct "loss". b) Ends on the earlier of: 1) The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or 2) The date when business is resumed at a new permanent location.

*Id.* at 38-39 § G(11).

### ii.   The Business Income Provision

According to the Policy, Cincinnati

> will pay for the actual loss of "Business Income" and "Rental Value" [the insured] sustain[s] due to the necessary "suspension" of [its] "operation" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

---

[1] This opinion cites to the original pagination of this Form. The Form begins on page 23 of the Policy's ECF pagination.

*Id.* at 18 § E(b)(C)(1).

### iii.    The Extra Expense Provision

According to the Policy, Cincinnati

> will pay for Extra Expense [the insured] sustain[s] during the "period of restoration". Extra Expense means necessary expenses [the insured] sustain[s] . . . during the "period of restoration" that [it] would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

*Id.* at 19 § E(b)(C)(2)(a). Subparagraph (b) of the Extra Expense provision states,

> If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses . . . to: 1) Avoid or minimize the "suspension" of business and to continue "operations" either: At the "premises"; or At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or 2) Minimize the "suspension" of business if [the insured] cannot continue "operations".

*Id.* at 19 § E(b)(C)(2)(b).

The Policy also states that Cincinnati "will also pay expenses to: 1) Repair or replace property; or 2) Research, replace or restore the lost information on damaged 'valuable papers and records'; but only to the extent this payment reduces the otherwise payable 'Business Income' 'loss'." *Id.* at 19 § E(b)(C)(2)(c).

### iv.    The Civil Authority Provision

The Policy provides that

> [w]hen a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", [Cincinnati] will pay for the actual loss of "Business Income" and necessary Extra Expense [the insured] sustain[s] caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply: (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage,

4

> or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 19 § E(b)(C)(3).

### v.    The Ingress and Egress Provision

According to the Policy, Cincinnati

> will pay for the actual loss of "Business Income" [the insured] sustain[s] and necessary Extra Expense [the insured] sustain[s] caused by the prevention of existing ingress or egress at a "premises" shown in the Declarations due to direct "loss" by a Covered Cause of Loss at a location contiguous to such "premises". However, coverage does not apply if ingress or egress from the "premises" is prohibited by civil authority.

Policy, Business Income (and Extra Expense) Form, at 5 § A(5)(e).[2]

### vi.    The Sue and Labor Provision[3]

According to the Policy,

> [i]n the event of "loss" to Covered Property, [the insured] must . . . [t]ake all reasonable steps to protect the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Keep a record of [the insured]'s expenses necessary to protect the Covered Property for consideration in the settlement of the claim. This will not increase [the insured]'s limit of insurance. However, in no event will we pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss.

Policy, Building & Personal Property Coverage Form, at 30-31 § D(3)(a)(4).

---

[2] This opinion cites to the original pagination of this Form. The Form begins on page 111 of the Policy's ECF pagination.

[3] The "Sue and Labor coverage is not a separate coverage. Instead, it is a provision that appears in the section of the Policy titled 'Duties in the Event of Loss or Damage.'" Def. the Cincinnati Ins. Co.'s Mem. of L. in Supp. of its Mot. to Dismiss, ECF No. 13-1, at 7 n.1 (Dec. 18, 2020) ("Def. Mem."). *See* Compl. ¶ 33 ("[S]ections titled 'Duties in the Event of Loss', require in the event of a loss that the policyholder take all reasonable steps to protect the Covered Property from further covered damages, and keep a record of the expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This is commonly referred to as 'Sue and Labor' coverage.").

### B.  Procedural History

On October 30, 2020, Farmington filed its Complaint against Cincinnati. Compl.

On December 18, 2020, Cincinnati filed a motion to dismiss Farmington's Complaint. Def. Mot.; Def. Mem.

On January 14, 2021, Farmington filed an opposition to Cincinnati's motion to dismiss. Mem. of L. in Opp'n to the Def.'s Mot. to Dismiss, ECF No. 19 (Jan. 14, 2021) ("Pl. Opp'n").

On January 28, 2021, Cincinnati filed a reply to Farmington's opposition to its motion to dismiss. Reply in Supp. of Def. the Cincinnati Ins. Co.'s Mot. to Dismiss, ECF No. 21 (Jan. 28, 2021) ("Def. Reply").

On February 10, 2021, Farmington filed a sur-reply. Pl.'s Sur-reply in Opp'n to Mot. to Dismiss, ECF No. 25 (Feb. 10, 2021).

On February 24, 2021, Cincinnati filed the first of several notices of supplemental authorities in support of its motion to dismiss. Cincinnati Ins. Co.'s Mot. to File Suppl. Auth., ECF No. 28 (Feb. 24, 2021); *see also* ECF No. 35 (Mar. 10, 2021); ECF No. 38 (Mar. 26, 2021); ECF No. 41 (Apr. 2, 2021); ECF No. 50 (June 22, 2021); ECF No. 51 (July 2, 2021).

On March 2, 2021, Farmington filed the first of two notices of supplemental authorities in support of its opposition to Cincinnati's motion to dismiss. Mot. to Cite Additional Auth., ECF No. 33 (Mar. 2, 2021); *see also* ECF No. 37 (Mar. 25, 2021).

On July 7, 2021, a motion hearing was held by videoconference to address the pending motion to dismiss. Min. Entry, ECF No. 53 (July 7, 2021).

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon

which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy*

*v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.   DISCUSSION

Farmington alleges claims against Cincinnati for: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). Compl. Defendants have moved to dismiss the Complaint in its entirety. Def. Mot.

The Court will address each claim in turn. [4]

### A.   The Breach of Contract Claim

As the Connecticut Supreme Court recently affirmed:

> An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract. In accordance with those principles, the determinative question is the intent of the parties, that is, what coverage the insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the policy.

---

[4] Both parties cite to and appear to agree that Connecticut law applies here. *See* Def. Mem. at 7 ("Under Connecticut law, proper insurance contract interpretation requires the Court to read the contract as a whole, consider all relevant portions together and give operative effect to every provision."); Pl. Opp'n at 1-2 ("As Farmington . . . shall show, using Connecticut rules of contract interpretation, a policyholder could reasonably interpret and expect 'physical loss or physical damage' to mean the loss of use of tangible property that is not structurally altered."). In any event, "courts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 n.2 (2d Cir. 2013). While, as discussed below, this Court does not find the application of Connecticut's substantive law to be "uncertain or ambiguous," if it had, "the job of the federal court is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).

*Jemiola Tr. of Edith R. Jemiola Living Tr. v. Hartford*, 335 Conn. 117, 128 (2019) (alterations omitted) (quoting *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 37-38 (2014)). If the insurance contract's language is "clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Id.* at 128-29. In interpreting this language, the Court "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Id.* at 129.

Indeed, the Connecticut Supreme Court was clear it "will not" – "torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Id.* (internal quotation marks and citations omitted). "[A] provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Id.* (internal quotation marks and citations omitted).

Farmington argues that "[the] Policy is a contract under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiff's losses for claims covered by the Policy." Compl. ¶ 74. More specifically, Farmington argues that "[i]n the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the 'period of restoration.'" *Id.* ¶ 75.

Farmington argues Governor Lamont of the State of Connecticut issued "Connecticut Closure Orders" on March 10, 2020, March 20, 2020, March 26, 2020, September 1, 2020, and

February 9, 2021, and "the Connecticut Department of Public Health . . . issued directives and guidance related to COVID-19 commencing on March 16, 2020," "causing the suspension of [Farmington's] routine operations." *Id.* ¶¶ 49-57. Farmington argues that "[t]he Pandemic has constituted a disaster," *id.* ¶ 62, and [t]he Governor of the State of Connecticut and the State of Connecticut Public Health Department are civil authorities contemplated by Defendant's Policy," *id.* ¶ 61.

According to Farmington, "[l]osses caused by SARS-CoV-2, the COVID-19 Pandemic and the related orders issued by state, and federal authorities triggered the Business Income, Extra Expense, Civil Authority, Ingress and Egress and Sue and Labor provisions of Defendant's policies." *Id.* ¶ 34. Farmington argues that, "[b]y denying coverage for loss of Business Income and necessary Extra Expense sustained by action of a Civil Authority, Defendant has breached its coverage obligations under the Policy." *Id.* ¶ 92.

In sum, Farmington argues that the "definition of loss . . . includes a plain reading of 'accidental physical loss or accidental physical damage' of property, that the plaintiff's losses are covered, and **t**here are no exclusions that apply[, and alleges that] [t]his language is very broad and inclusive." Pl. Opp'n at 10 (emphasis omitted). In support, Farmington relies on *Studio 417, Inc. v. Cincinnati Insurance Company*, No. 20-CV-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020), where the Western District of Missouri held that "the Policies provide coverage for accidental physical loss or accidental physical damage, and . . . Cincinnati conflates loss and damage." Pl. Opp'n at 14 (emphasis omitted) (quoting *Studio 417*, 2020 WL 4692385, at *5). Farmington alleges that "[r]ejecting this argument, the court held that it 'must give meaning to both terms.'" *Id.* (quoting *Studio 417*, 2020 WL 4692385, at *5).

Farmington also relies on *Yale University v. Cigna Insurance Company*, 224 F. Supp. 2d 402 (D. Conn. 2002), in which Chief Judge Underhill explained that:

> The insurer also fails even to consider, let alone distinguish, the substantial body of case law in which a variety of contaminating conditions have been held to constitute "physical loss of or damage to property." . . . Yale has sustained its burden of demonstrating that it has suffered "physical loss of or damage to property" as required under the all risk policies for the presence of asbestos or lead contamination in its buildings.

Def. Opp'n at 17-18 (quoting *Yale Univ.*, 224 F. Supp. 2d at 413-12). Farmington also argues that "[c]ourts [] have found 'direct physical loss' when property was rendered uninhabitable due to the imminent risk of harm." *Id.* at 19 (collecting cases).

Alternatively, Farmington argues that if coverage should not be provided under a plain reading of the insurance policy, and the Court "finds that the grant of coverage is ambiguous insofar as 'physical loss' is not defined in the policy, the Court must resolve this ambiguity against the insurer as the drafter of the policy." *Id.* (citing *Lexington Ins. Co.*, 311 Conn. at 37-38 (2014)). It argues that

> [a]t a minimum, the plaintiff's interpretation of the policy is certainly plausible under the circumstances as covering the plaintiff's accidental physical loss. Accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in the plaintiff's favor, it would not be appropriate, fair, or just to dispense with the case at the motion to dismiss stage.

*Id.* at 11. Farmington further alleges "[t]he plausibility threshold is such that it presents the opportunity for discovery into policy language, underwriting, and claims handling which should be of assistance to the Court on the merits." *Id.* at 32.

Cincinnati argues that no such breach occurred. Def. Mot; Def. Mem. It argues that "[t]he expectations of an insured cannot control over the unambiguous language of the policy." Def. Mem at 7. Cincinnati argues that Farmington's "commercial property policy provides coverage

for physical loss or physical damage to covered property[, and] [the Policy] simply does not provide coverage for the purely economic loss allegedly suffered by [Farmington]." Def. Reply at 10. According to Cincinnati, Farmington has "acknowledge[d] that direct physical loss or physical damage to property is required for coverage under the Policy." Def. Mem. at 8. Cincinnati argues that "these words are not ambiguous" and Farmington "does not allege any facts establishing a distinct, demonstrable, physical alteration of property at its premises." *Id.* Cincinnati further argues that "[t]here is no Connecticut decision holding that the presence of a virus constitutes direct physical loss to property." *Id.*

Cincinnati further argues that "Civil Authority coverage requires direct physical loss or damage to property other than Plaintiff's property. And, that physical loss or damage must cause a civil authority to issue an order prohibiting access to the Plaintiff's premises." *Id.* at 25. According to Cincinnati, "[j]ust as the virus is not causing direct physical loss or damage to Plaintiff's premises, it is not causing direct physical loss or damage to other property. Likewise, the virus and the Orders are not prohibiting access to Plaintiff's premises." *Id.* In its view, "[t]here are no alleged facts showing any change or alteration of anybody's physical property by the Coronavirus or the Orders." *Id.* at 26.

Cincinnati finally argues there is Farmington is not entitled to "Ingress and Egress coverage[, because such coverage] requires both a direct physical loss at a location contiguous to the insured's property, and the prevention of access to the insured's property as a result of that direct physical loss." *Id.* at 28. Cincinnati argues that "[i]t is undisputed that access [to Farmington's premises] was never prohibited." *Id.* at 25.

According to Cincinnati, Connecticut law "construes direct physical loss or damage to require an actual alteration or change in property," and Second Circuit caselaw "requires an

alteration or change and does not afford coverage for intangible economic losses." *Id.* at 8

(collecting cases). Cincinnati highlights the district court's decision in *England v. Amica Mut.*

*Ins. Co.*, No. 3:16-CV-1951 (MPS), 2017 WL 3996394 (D. Conn. Sept. 11, 2017), in which

Judge Shea explained that

> to the extent [the plaintiff] is seeking coverage for a chemical reaction alone as a "direct physical loss," [her] claim fails. While the resultant cracking within [the plaintiff]'s walls likely qualifies as "direct physical loss" to the Property, and "loss" as used in the Policies embraces the financial consequences thereof . . . the chemical reaction itself, absent any physical manifestation in the Property marking a change to an unsatisfactory state, is not a "direct physical loss" or other "loss" under the Policy.

*Id.* at *8; *see* Def. Mem. at 9; *see also Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308

Conn. 760, 782 (2013) ("The policy defines property damage as physical injury to tangible

property, including all resulting loss of use of that property. . . . We hold that under the plain

language of the commercial general liability policy, the escape of carbon monoxide, without

more, is not property damage." (internal alterations and quotation marks omitted)); *Best Friends*

*Pet Care, Inc. v. Design Learned, Inc.*, 77 Conn. App. 167, 183 (2003) ("We find no indication

that the term property insurance was intended to encompass intangibles; to the contrary, the

contract language refers specifically to 'physical loss.'").

Cincinnati then argues that Farmington "does not allege facts demonstrating that the virus

(or the Orders) caused any physical alteration to its property." Def. Mem. at 11. It further argues

that "direct physical loss requires actual, tangible, permanent, physical alteration of property."

*Id.* Cincinnati references many recent, albeit out of district, court decisions that have addressed

Cincinnati's policies specifically and "h[e]ld that the Coronavirus and related orders do not cause

actual, tangible, structural loss or damage to property." *Id.* at 12 (citing *Catlin Dental, P.A. v.*

*The Cincinnati Indem. Co.*, No. 20-CA-004555 (20th Cir. Ct., Lee Cnty., Fl. Dec. 11, 2020);

*Promotional Headwear Int'l v. The Cincinnati Ins. Co.*, No. 20-cv-2211(JAR) (GEB), 2020 WL 7078735 (D. Kan. Dec. 3. 2020; *4431, Inc. v. Cincinnati Ins. Cos.*, No. 5:20-cv-04396, 2020 WL 7075318 (E.D. Pa. December 3, 2020); *T&E Chicago LLC v. The Cincinnati Ins. Co.*, No. 20 C 4001, 2020 WL 6801845 (N.D. Ill. Nov. 19, 2020); *Uncork and Create LLC v. The Cincinnati Ins. Co.,* No. 2:20-cv-00401, 2020 WL 6436948 (S.D. W.V. November 2, 2020); *Vandelay Hospitality Grp. LP v. The Cincinnati Ins. Co.*, No. 3:20-cv-1348-D, ECF No. 41 (N.D. Tex. Oct. 7, 2020); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, No. 4-20-CV-222 (CRW) (SBJ), 2020 WL 5820552 (S.D. Iowa Sept. 29, 2020); *Sandy Point Dental, P.C. v. The Cincinnati Ins. Co.*, No. 20-CV-2160, 2020 WL 5630465 (N.D. Ill., September 21, 2020)). According to Cincinnati, these "holdings are consistent with the national consensus of authority holding that Coronavirus and related orders do not constitute direct physical loss or damage to property as a matter of law." *Id.* at 12-14 (listing cases).

In Cincinnati's view, *Studio 417* "is an outlier" and the Western District of Missouri "expressly indicated that its determination that the virus and/or the orders may cause direct physical loss might need to change as additional authorities develop." Def. Reply at 8-9 (emphasis omitted) (citing *Studio 417*, No. 20-cv-03127-SRB, 2020 WL 4692385, at *8). Cincinnati also argues that *Yale University v. Cigna Insurance Company* "actually advance[s] [its] argument because [in the case] there was physical harm or alteration" existed. Def. Reply at 6. Cincinnati points to the fact that the court there found that "[t]here is little doubt that Yale could not properly seek coverage under the all risk policies for costs incurred due to the mere presence of asbestos-and lead containing materials in its buildings." *Id.* (quoting *Yale Univ.*, 224 F. Supp. 2d at 412). In *Yale University*, the plaintiff was forced to replace windows, strip and repaint trim and strip and repaint doors due to the presence of asbestos. *Id.* Cincinnati asserts that

14

this case is unlike *Yale University*, because "in *Yale*, there was evidence of physical harm to property that required repair." *Id.* 6-7.

The Court agrees.

Under the terms of the operative property insurance policy, Cincinnati has an obligation to provide insurance coverage for "direct 'loss' to Covered Property at the premises' caused by or resulting from any Covered Cause of Loss." Policy, Building & Personal Property Coverage Form at 5 § A(3)(a). "'Loss' means accidental physical loss or accidental physical damage." *Id.* at 38 § G(8). If there is a "loss" within the meaning of the policy, the insured is entitled to the recovery of "actual loss of 'Business Income' and 'Rental Value,'" as well as "Extra Expense" incurred due to time of business disruption until the "period of restoration." *See id.* at 18 § E(b)(C)(1); *id.* 19 § E(b)(C)(2)(a).

Under this insurance policy, an entitlement to insurance coverage is predicated on any alleged loss being within the scope of the term "loss" under the meaning of the contract. *See e.g.*, Policy, Business Income (and Extra Expense) Form, at 4 § A(5)(e). ("We will pay for the actual loss of 'Business Income' you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a 'premises' shown in the Declarations due to direct 'loss' by a Covered Cause of Loss at a location contiguous to such 'premises'. However, coverage does not apply if ingress or egress from the 'premises' is prohibited by civil authority."); *see also* Policy, Building & Personal Property Coverage Form, at 19 § E(b)(C)(3). ("When a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises', we will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises'."). Because there is no actual physical loss or damage to Farmington Village's property caused by the

presence of the coronavirus or COVID-19, Farmington Village instead argues that because they could not – and to some degree, still cannot – operate fully, because of the ongoing pandemic, they nevertheless are entitled to recover under the insurance policy because their property cannot be used to the extent it had been before the pandemic. *See* Compl. ¶ 67 ("The State of Connecticut, through the Governor and Department of Public Health, have issued and continue to issue authoritative orders governing Connecticut citizens and businesses, including the Plaintiff's business, in response to COVID-19 and the Pandemic, the effect of which have caused and continue to cause Plaintiff to cease and/or significantly reduce operations at the premises.").

And as a result, they allegedly have suffered a "physical loss or damage" within the meaning of the insurance policy. *See id.* ¶ 66 ("The existence of SARS-CoV-2 caused direct 'physical loss' and/or risk of 'physical damage' to the covered property or 'premises' under the Plaintiff's Policy, by denying use of and damaging the covered property, and by causing a necessary suspension (in whole or in part) of operations during a period of restoration and requiring prevention and restoration measures").

Under Connecticut law, however, losses due to a property's inoperability without any physical loss or damage to the property itself are not recoverable with this type of property insurance coverage. Significantly, the Connecticut Supreme Court's decision in *Capstone* held that "under the plain language of the commercial general liability policy, the escape of carbon monoxide, without more, is not property damage." 308 Conn. at 782. As a result, "the loss of the use of the defective chimneys, standing alone, did not constitute property damage under either of the policy's definitions." *Id.* at 783. Thus, "the escape of carbon monoxide alone does not qualify as property damage." *Id.*

16

As a result, after *Capstone*, Farmington Village's alleged "loss" from the presence of COVID-19, like the escape of carbon monoxide, "alone does not qualify as property damage." *Capstone,* 308 Conn. at 783; *see England*, 2017 WL 3996394 at *8 (applying *Capstone* and recognizing "that, to the extent [the policyholder] is seeking coverage for a chemical reaction alone as a 'direct physical loss,' [her] claim fails"); *see also Mazzarella v. Amica Mut. Ins. Co.*, No. 3:17-CV-598 (SRU), 2018 WL 780217, at *3 (D. Conn. Feb. 8, 2018), *aff'd*, 774 F. App'x 14 (2d Cir. 2019) ("Though [the defendants] allege that the damage . . . . was caused by oxidation due to water and oxygen in the concrete . . . two important questions still remain: (1) *what* damage was caused to the concrete basement walls (i.e., cracking, bulging, etc.); and (2) how were the *other* named areas of the house . . . damaged by this oxidation . . . [A]ny claim by the [defendants] that the oxidation *itself* is the direct physical loss is without merit." (emphasis in original) (quotation marks and citations omitted)).

While Farmington Village argues that the loss of the use of its property due to COVID-19 warrants a different result from the loss of the use of the property in *Capstone* due to "the escape of carbon monoxide," there is no doctrinal basis for providing a different result. In both circumstances, an external condition resulted in the loss of the use of the property, but did not result in physical damage or physical loss to the property. *See Capstone*, 308 Conn. at 783. Indeed, the Connecticut Supreme Court's holding in *Capstone*, and its straightforward application by two other judges in this District in similar contexts, distinguishing between loss of the use of the property only, from loss of the use of the property due to actual physical loss or damage to the property, *see England*, 2017 WL 3996394, at *8; *Mazzarella*, 2018 WL 780217, at *3, also forecloses Farmington Village's secondary argument for coverage: that the Cincinnati policy language is ambiguous and therefore, "must be construed in favor of the insured because

17

the insurance company drafted the policy," *Jemiola Tr.*, 335 Conn. at 129 (internal quotation marks and citations omitted).[5] Instead, because "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms," *Id*. at 129 (internal quotation marks and citations omitted), this interpretation of similar, if not the same, insurance policy language leaves Farmington Village with no plausible ambiguity regarding this loss language in its property insurance policy.

Because this definition of loss, where the presence of COVID-19 alone without any other physical damage or loss to the property, is not covered under Farmington Village's insurance policy, all of Farmington Village's other arguments for coverage under this same insurance policy, whether it be for Civil Authority coverage or the Ingress and Egress coverage, also fail.

Accordingly, Cincinnati's motion to dismiss the breach of contract claim will be granted.

**B.  The Breach of the Covenant of Good Faith and Fair Dealing Claim**

In Connecticut, the majority of contracts carry "an implied covenant of good faith and fair dealing," which requires both parties to refrain from doing "anything that will injure the right of the other to receive the benefits of the agreement." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576 (Conn. App. 2004); *see also Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 566 (1984) (noting that the Restatement (Second) of Contracts recognizes this covenant in every contract "without limitation"). "The covenant . . . presupposes that the terms and purpose of the contract are agreed upon by the parties and what is in dispute is a party's discretionary application or interpretation of a contract term." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). To fulfill its duty, a party may not "do anything that will injure the right of the other to receive the benefits of the agreement." *Id*. at 432 (internal

---

[5] The application of Connecticut law and its clarity distinguishes this case from the contrary *Studio 417* decision in the Western District of Missouri.

quotation marks omitted) (quoting *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 564 (1999) .

Under Connecticut law, a party asserting a breach of the covenant of good faith and fair dealing must prove three elements:

> [F]irst, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith.

*Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 359-60 (quoting *Franco v. Yale*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002)). Bad faith implies "both 'actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation . . . prompted . . . by some interested or sinister motive.'" *Habetz v. Condon*, 224 Conn. 231, 237 (1992) (citation omitted).

Farmington argues that Cincinnati

> violated the covenant of good faith and fair dealing by using a predetermined decision not to cover any claim; failing to properly inquire into relevant facts supporting their denial; failing to take the appropriate procedures for handling Plaintiff's claim; declining to make clear, and good faith efforts to resolve the contractual relationship between Plaintiff and Defendant.

Compl. ¶ 99.

Cincinnati argues that "a plaintiff cannot recover for bad faith if the insurer denies a claim that is 'fairly debatable,' *i.e.*, if the insurer had some arguably justifiable reason for refusing to pay or terminating the claim." Def. Mem. at 29 (quoting *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 177 (D. Conn.), *adhered to on reconsideration sub nom.*, 2005 WL 8165602 (D. Conn. Sept. 29, 2005)).

The Court agrees.

Because, as noted above, Farmington Village's breach of contract claim fails, its breach of the covenant of good faith and fair dealing claim fails as well. *See Valls v. Allstate Ins. Co.*, No. 3:16-CV-01310 (VAB), 2017 WL 4286301, at *5 (D. Conn. Sept. 27, 2017), *aff'd*, 919 F.3d 739 (2d Cir. 2019) ("While each contract imposes a duty of good faith and fair dealing on the parties, Connecticut law requires a breach of contract in order to plead bad faith."); *see also Manseau v. Allstate Ins. Co.*, No. 3:16-CV-1231 (MPS), 2017 WL 3821791, at *5 (D. Conn. Aug. 31, 2017) (dismissing breach of implied covenant claim in concrete case after court dismissed breach of contract claim); *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 380 (D. Conn. 2017) (same).

Accordingly, Cincinnati's motion to dismiss the breach of the covenant of good faith and fair dealing claim will be granted.

### C.  The CUTPA/CUIPA Claims

A plaintiff may bring a private cause of action under the Connecticut Unfair Trade Practices Act, "CUTPA," to enforce alleged violations of the Connecticut Unfair Insurance Practices Act, "CUIPA." *Kim v. State Farm Fire & Cas. Co.*, No. 3:15-cv-879 (VLB), 2015 WL 6675532, at *5 (D. Conn. Oct. 30, 2015) (citing *Mead v. Burns*, 199 Conn. 651, 663 (1986)). CUTPA/CUIPA claims "are premised on finding a breach of contract." *Kim v. State Farm Fire & Cas. Ins. Co.*, 751 F. App'x 127, 128 n.1 (2d Cir. 2018); *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008) ("The foregoing analysis disposes of the plaintiffs' claim that the trial court improperly rendered summary judgment in favor of the defendant on the plaintiffs' CUTPA and CUIPA claims. Because we have concluded that the defendant's interpretation of the policy's coverage limitation was correct, there can be no genuine issue of material fact as to

whether the application of that interpretation as a general business practice constituted oppressive, unethical or unscrupulous conduct in violation of the statutes.").

CUTPA provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action." Conn. Gen. Stat. § 42-110g(a).

A plaintiff must meet two requirements to bring a CUTPA claim. "First, the plaintiff must establish conduct that constitutes an unfair or deceptive trade practice. Second, the plaintiff must establish a basis for a reasonable estimate of damages." *Chem-Tek, Inc. v. Gen. Motors Corp.*, 816 F. Supp. 123, 130 (D. Conn. 1993) (citing *A. Secondino & Son, Inc. v. LoRicco*, 215 Conn. 336, 576 A.2d 464 (Conn. 1990)); *see also McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 534-36 (D. Conn. 2020) (dismissing CUTPA claims for failure to meet threshold requirements); *Bellemare v. Wachovia Mortg. Corp.*, 94 Conn. App. 593, 606 n.6 (2006) ("CUTPA provides a statutory cause of action for any person who has suffered an ascertainable loss of money or property as a result of an unfair trade practice.").

There are generally "two methods a court uses for determining whether a practice violates CUTPA." *Locascio v. Imports Unlimited, Inc.*, 309 F. Supp. 2d 267, 271 (D. Conn. 2004). "First, and simplest, the Commissioner of Consumer Protection sets forth certain regulations a violation of which is a *per se* violation." *Id.* (citing Conn. Gen. Stat. § 42-110b(c) (the Commissioner may "establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive")); Conn. Agencies Regs. § 42-110b-28). "Second, if no regulation covers the practice in question, the court applies the so-called 'cigarette rule.'" *Id.*; *see*

21

*also Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn.

2007). The factors weighed under the cigarette rule are

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other business[persons]).

*Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004) (internal quotation marks

omitted). "All three criteria do not need to be satisfied to support a finding of

unfairness." *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 105-06 (1992).

"CUIPA identifies and prohibits a number of 'unfair methods of competition and unfair

and deceptive acts or practices in the business of insurance.'" *Kim*, 2015 WL 6675532, at *5

(citing Conn. Gen. Stat. § 38a-316.) "Among these are '[u]nfair claim settlement practices' such

as 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in

which liability has become reasonably clear.'" *Id.* (quoting Conn. Gen. Stat. § 38a-316(6)(F)).

To prevail on a CUIPA claim, a plaintiff must show that "the unfair settlement practice was

committed or performed with such frequency as to indicate a general business practice."

*McCulloch*, 363 F. Supp. 2d at 182.

Farmington argues that Cincinnati has violated CUTPA by "refusing to pay claims

without conducting a reasonable investigation based upon all available information, failing to

attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which

liability is reasonably clear, and compelling insureds to institute litigation to recover amounts

due under an insurance policy." Compl. ¶ 102.

Farmington also argues that Cincinnati "told investors that it will not honor business interruption claims connected to the COVID-19 virus and has a predetermined strategy to deny all COVID-19 related claims." *Id.* ¶ 104. Furthermore, Farmington argues "[Cincinnati]'s actions . . . constitute violations of the Connecticut Unfair Practices Act . . . and were committed with such frequency as to indicate a general business practice." *Id.* ¶ 107. According to Farmington, these practices included:

> (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue; (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claim in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

*Id.* ¶ 106. Farmington argues that "[a]s a result of [Cincinnati]'s deceptive acts . . . [Farmington] failed to receive the coverage and benefits required by the policy of insurance at issue herein, and otherwise have incurred severe ascertainable losses as a direct and proximate result." *Id.* ¶ 110.

In response, Cincinnati argues that "[s]ince Plaintiff cannot assert a viable breach of contract claim, Plaintiff does not have an actionable extra-contractual claim for bad faith or unfair insurance practices." *Id.* (citing *Hurlburt v. Massachusetts Homeland Ins. Co.*, 310 F. Supp. 3d 333, 345 (D. Conn. 2018) ("Connecticut law requires a breach of contract in order to plead bad faith." "[B]ecause [the insureds] have failed to plead a plausible breach of contract claim, no CUTPA or CUIPA claim can follow.").

The Court agrees.

Again, because Farmington Village's breach of contract claim fails, its CUTPA and CUIPA claims fail as well. *See Roberts v. Liberty Mut. Fire Ins. Co.*, 264 F. Supp. 3d 394, 416 (D. Conn. 2017) ("As with breach of the implied covenant of good faith and fair dealing, a claim for violation of CUTPA/CUIPA cannot succeed in the absence of a viable claim for breach of contract."); *see also Agosti*, 279 F. Supp. 3d at 381 ("Because I dismiss [Plaintiffs'] claim against Allstate for breach of contract, I also dismiss [their] claim for violation of CUTPA and CUIPA pursuant to Rule 12(b)(6).")

Accordingly, Cincinnati's motion to dismiss the CUTPA and CUIPA claims will be granted.

### D.  Leave to Amend

Under Federal Rule of Civil Procedure 15(a),

> [a] party may amend its pleading once as a matter of course within:
> (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The district court has broad discretion to decide a motion to amend. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998).

Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lucente v. Int'l*

*Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)"). "[A] motion for leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Phillip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006) (citing *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003)); *see also Kimm*, 884 F.3d and 105-06 ("Therefore, because the proposed amendments would have no impact on the basis for the district court's dismissal and would consequently be futile, the district court did not abuse its discretion in denying [plaintiff] leave to amend." (citing *Ellis*, 336 F.3d at 127)).

As explained above, under Connecticut law, Farmington's alleged loss based on the presence of COVID-19 alone, without more, is not within the definition of "physical loss or damages" under its insurance policy with Cincinnati. To the extent, however, something more than the presence of COVID-19 alone can be alleged as a loss and a basis for insurance coverage, then this motion to dismiss will be granted without prejudice. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) ("One good reason to deny leave to amend is when such leave would be futile.").

Accordingly, Farmington's Complaint will be dismissed with leave to amend, but only if the deficiency expressly defined above can be remedied by further pleading.

## IV.   CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**.

To the extent something more than the presence of COVID-19 alone can be alleged as a loss and a basis for insurance coverage, Farmington may file an Amended Complaint by **August 20, 2021**. If they cannot do so by this date, the dismissal of this Complaint will be with prejudice.

.

**SO ORDERED** at Bridgeport, Connecticut, this 19th day of July, 2021.

/s/ Victor A. Bolden      
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE